Statement of the Case.
NICHOLLS, J.
The plaintiff, in her own-right, as widow of Charles A. Ray, prays for *503 Judgment against the defendant company for .$10,130, with legal interest from judicial dejnand, by way of damages which she had suffered from the death of her husband, occasioned, it is claimed, by its fault and negli.gence.
She alleges that her husband was employed in the month of February, 1903, by the defendant company, as a night switchman in its yards in the city of Shreveport. That on the night of February 5, 1903, in the said ¡switchyards, her husband, while in the discharge of his duty in the line of his employment, was run over and killed by a switch engine of the defendant company, through the negligence, fault, torts, and want of skill, prudence, and care on the part of the defendant, its officers, agents, servants, and employés, and without any negligence or fault or want ■of skill, prudence, or care on his part.
That in the nighttime of the 5th day of February, 1903, the defendant, through its servants, agents, and employés, was using and 'operating a switch engine in said switch-.yards in pulling and pushing and switching cars from one track to another, and uncoupling and coupling and attaching them together in making up a train of cars, under the direction, supervision, and control of the .yardmaster, and that her husband was there ■engaged at that time as night switchman with said switch engine in the discharge of his duty and in the line of his employment. -That at the place where her husband was so engaged with said switch engine there were several tracks, switches, turnouts, frogs, and .guard rails, and a puzzle switch.
That when the engineer and fireman in ■charge of and operating said switch engine moved it a short distance above the said switch, in order to push or move it onto another track, her husband, as he was required to do, threw the switch or adjusted the switch •so as to connect with another track, in order that the switch engine might pass onto the ■same. That when he had so thrown or adjusted it, making the connection of the tracks, he gave the usual signal to the engineer and fireman in charge of and operating the switch engine to back, push, pull, or move the same in reverse direction onto the track with which the connection had been so made, which the engineer and fireman then proceeded to do. That, as the switch engine was slowly so proceeding, he attempted, in a prudent, skillful, and cautious manner, to mount or step upon the footboard of the switch engine — the place provided thereon by defendant for the use of switchmen in the operation of the switch engine — as he was required to do in the discharge of his duty, in the regular course of his employment, in order to go down the track on said engine to couple or connect it with other cars in making up said train.
That, when he entered for such purpose upon the track with which'such connection had been made, his foot was there caught, and became fastened and jammed between the main rail, of the track and an adjacent guard rail, and his foot was there held fast between these two rails, in the hollow spaces of the rails below the top or ball of the said rails, and he could not unloosen or extricate it from its fastenings, and he was thereby dragged under the wheels of the advancing switch engine, and he was thereby run over, mutilated, and killed while his foot was so held and fastened between the main rail and the guard rail. That at that place the roadbed of the railroad had been imperfectly, improperly, and unskillfully constructed, in this: that the roadbed had become wet, soaked, and soft from frequent rains, and the weight of the engine and cars in frequently passing over that place had pressed the cross-ties there into the dirt or soil, and that, in order to obtain a pretended drainage of the track or roadbed at that place, the officers, agents, servants, and employés of the railroad company, shortly before the death of her husband, had entirely removed the dirt or soil from the spaces between the cross-ties at that *505 place for the full depth of the ties, and for the full width of the track, and there was no ballast, dirt, soil, or other substances or filling or protection between the cross-ties there, and the track or roadbed there was unskillfully, improperly, and imperfectly constructed, and the same was there in bad condition and state of repair, rendering the footing there to night switchmen and other employés and servants of the defendant company insecure, unsafe, and dangerous.
That the space there between the main rail and the guard rail, where his foot was caught and fastened, was not plugged, filled, or blocked with wood or other substance, or protected or secured in any way by any other means or device, and that the officers, servants, agents, and employés of defendant had failed and neglected to plug, fill, or block the space between the rails where his foot was caught and fastened, whereby he was killed, as stated, in order to secure and protect night switchmen and other employés of defendant company working there in said switchyards from stexiping into said space between the rails and getting a foot fastened therein, but that the space between the main and guard rails where his foot was caught and fastened was left by defendant, its officers, agents, servants, and employés, open, unsecured, and unprotected. That it was on account of the torts, faults, and negligence of defendant, its officers, agents, servants, and employés, in improperly and unskillfully constructing said track and roadbed there, and leaving it in a bad and unsafe condition of repair, rendering footing there to nigh't switchmen and other servants of said railroad corporation insecure, unsafe, and dangerous, and in failing to plug, fill, or block, or otherwise secure and protect, the space between the main rail and guard rail, whereby his foot was caught and fastened therein, that her husband was run over and killed by the switch engine, and that he was not so killed through any fault or negligence on his part, and that the defendant railroad corporation was liable to her in damages for the death of her husband.
That the danger from the imperfect and unskillful construction of the track, or roadbed there, and its bad and unsafe condition of repair, and from the facts that the space between the main rail and the guard rail there was not blocked, plugged, filled, or otherwise secured and protected, but left open and unprotected, were not apparent, obvious, or imminent, and that said defendant, its officers and other agents, servants, and employés,. were fully informed of the imperfect and unskillful construction of the roadbed there, and its bad and unsafe condition and state of repair, but that it ordinarily blocked, plugged, or filled, and thus secured and protected, the frogs and spaces between the main and the guard rails on the tracks, and in the switch-yards, and that her husband had only been employed as night switchman in the switch-yards for two days before he was killed — ■ that is to say, he had only worked as night switchman in said switchyards for one night, namely, the night previous 'to his death, and on the night of his death he had only been at work about one hour when he was killed, both of said nights being dark, cloudy, and rainy nights — and that he had had no other acquaintance with, or information concerning, or service or experience in, said switchyard, or the said track, or roadbed, or the environments and conditions there, and was not informed, and had no opportunity to be informed, of the imperfect and unskillful construction of the track or roadbed, and the bad and unsafe condition of repair thereof, and he was not informed, and had had no opportunity to be informed, that the space between the main rail and the guard rail, where his foot was caught and fastened, had not been plugged, filled, or otherwise secured and protected, and he did not know, and had had no opportunity to know, that the space between said rails where his foot was caught and fastened had been left open, unblocked, unfilled, *507 unplugged, and unsecured and unprotected in any way.
That reasonable prudence, care, and skill in the operation of said railroad and the switchyard required the officers, agents, servants, and employSs of defendant company to keep the track and roadbed in a good and safe condition and state of repair, and to keep the space between the main and guard rails, where his foot was caught and fastened, blocked, filled, or plugged, or otherwise secured or protected, as was well known to and understood by the defendant company, its officers, agents, servants, and employés, as was customary and usual in the operation of such railroads and such switchyards, but that they negligently, and without skill, care, or prudence, failed and omitted to do so.
That her husband died without descendants, and that she had a right to sue herein in her own name, for her own use and benefit, and that her husband was about 40 .years of age, in good health, and with sound constitution, and reasonable expectancy of long life, and a laboring man of more than ordinary skill, with an earning capacity of more than $100 per month, and that neither she nor her husband had any means, and that she was entirely dependent upon his labor for support, and that her husband’s untimely and horrible death had brought upon her great grief and mental anguish, and that she had thereby been deprived of his comfort and copipanionship and means of support, and that she had been thereby damaged by the said railroad company, by the death of her husband as aforesaid, in the sum of $10,-000, and in the further sum of $136.65, which she had to pay for his burial and funeral expenses. She prayed for judgment accordingly.
Subsequently plaintiff filed a supplemental petition, alleging that said switchyard and switch engine were used and operated jointly at the time of the death of her husband by the Vicksburg, Shreveport & Pacific Railway Company, and the Missouri, Kansas & Texas Railway Company of Texas, and that at the time of the death of her husband the switch engine was being used in switching cars for the latter company, and that both companies were therefore liable to her in solido for the damages claimed; and the Missouri, Kansas & Texas Railway Company of Texas, was made a party defendant.
The two defendants, in substance, answered to the same effect, with a general dénial, coupled with the special defense that the death of plaintiff’s husband was caused through no fault of defendants, but through the fault and negligence of plaintiff’s husband or of his fellow servants.
The jury returned a verdict, by a vote of ten to two, in favor of the plaintiff against the Vicksburg, Shreveport & Pacific Railway Company, but rejected the demand against the Missouri, Kansas & Texas Railway Company.
Judgment was rendered accordingly.
Plaintiff, without applying for a new trial, appealed from the latter judgment, and the Vicksburg, Shreveport & Pacific Railway Company appealed from the judgment against it after an unsuccessful application for a new trial.
Opinion.
The evidence shows that Charles A. Ray, the husband of the plaintiff, came to his death while engaged in the yards of the Vicksburg, Shreveport & Pacific Railway Company as a switchman making up a train of cars for the Missouri, Kansas & Texas Railway Company. The two companies mentioned had entered into a contract for the joint use of the terminals of the former corporation in the city of Shreveport. The contract provided, on the terms and conditions therein fixed, for the receiving, delivering, and hauling and switching of the freight *509 and passenger train engines of the Missouri, Kansas & Texas by the Vicksburg, Shreveport & Pacific Company.
It shows that at the point where the deceased was killed there were a number of tracks, switches, turnouts, frogs, guard rails, and a puzzle switch, and that, in the performance of their duties, switchmen had to constantly pass along and cross these tracks and switches. It appears that on the tracks at certain points in the railroad yards there are what are called “guard rails.” These are ■short rails laid near the main rails, which run for a short distance parallel to the main track, and then curve inward, leaving open ■spaces at the ends where these curves occur. Persons passing along or across the tracks and switches at those points are liable to have their feet caught in these open spaces, and have some difficulty in withdrawing the foot from them. Numerous accidents to switchmen and others have resulted from the existence of these open spaces, but the danger arising from the same had been greatly lessened, if not entirely done away with, by ■closing the space with blocks of wood, or with what are spoken of as “iron fitters.” So many accidents have arisen from these open spaces, that of recent years different railroad companies have voluntarily resorted to blocking them systematically, while in •some states blocking has been made imperative by statute. The open spaces at the ends •of the guard rails in the yard of the Vicksburg, Shreveport & Pacific Road at Shreveport had not been closed on the night of the 5th of December, 1903. On that night it became necessary to open one of the switches in that yard to enable a switching engine to pass through. The engine to the west of the switch, and heading east, had to advance eastward to pass through the switch. Ray, -on duty at the switch, threw it, and at once crossed to the south of the tracks, cleared the south rail, and signaled to the engineer, who was sitting on the right-hand side of the cab, to move forward. The engine at once started, went east to a baggage car which was to be switched, coupled the ear to the engine, and started back. Upon its return, after it had passed beyond the switch, it stopped. A switchman, who on the return trip had been standing on the footboard of the switch engine, just in front of the engine, noticed an object on the track a few feet to the east of the switch. Proceeding to the spot, he found it to be the body of Ray, lying with his face upward, and partly across the track, at a point a few feet to the east of the switch. Examination disclosed that his body was terribly mashed, and that his left foot had been cut off by the wheel of the engine. The missing foot was found a few feet to the west of the point where the body was found, tightly wedged into the open spaces of the guard rail, which was just to the east of the switch. The toes of the foot were at the mouth of the open space, and the heel pressed into the narrow space at the other end so closely that the foot was prized out with difficulty. Ray had on at that time a heavy overcoat, which kept the body from otherwise separating.
No one saw Ray at the time he was killed. Plaintiff’s theory of the case is that, as Ray went diagonally across the tracks to the point where his foot was caught, he signaled the engineer from that point to come on, but that he found his foot was caught in the guard rail, and before he could disengage it he was struck by the advancing engine, knocked down, and the engine passed over him. Defendant’s theory is that, after going to the south side of the track and signaling the engineer, Ray got upon the foot-board of the engine, which is just in front, and slipped off while he was moving across it to the left in order to arrange something upon the engine. This theory is supported by the engineer, Burnett, who insists that he saw him upon the footboard of the engine after the engine started, and saw him as he *511 moved to the left. Two or three witnesses testify that Ray did not cross the tracks diagonally, bnt went directly across the track from the switch lever and signaled to the engineer. They testified that after the accident they noticed that, between a point directly opposite to the switch lever and the point where the foot was found, the ground between the tracks gave evidence of something that had been dragged over it, like a body. It is urged, therefore, that when he got upon the footboard he fell from it at once, and was dragged by the engine to the point where the body was found; that, as the body was passing the guard rail, the foot dragged forward into the open space at the mouth of the guard rail, and the wheel of the engine, passing along afterwards, jammed or mashed the foot into it. Plaintiff assigns as a reason why Ray should have crossed diagonally to the- south rail of the track that he avoided, by so doing,: crossing a number of intervening rails, and because the ground between the tracks at that point was bad and boggy. This last contention is disposed of by the great preponderance of evidence, and there is no testimony whatever adduced to show that Ray crossed to the south rail diagonally. That claim rests entirely upon a supposition that he may have done so. We are not warranted, as between a supposition and direct testimony contrary to the supposition, to give weight to the former. We are obliged to give force to the testimony where the veracity of the witnesses is not attacked, and it is not attacked in this instance. It is true that the witnesses who testified on this subject were not directly at the spot, and may, at night, have been mistaken, from the distance at which they were, as to how Ray had made the crossing, but their testimony was very direct and certain on the subject. There is one matter as to which we think all parties agree, and that is that Ray reached and “cleared” the south rail of the track, and, after doing so, signaled the engineer. With this starting point, plaintiff’s theory of the situation would make-Ray return and place himself completely inside of the two tracks, face the approaching-engine, and attempt to get upon the foot-board by jumping upon it as the engine, then just in front of him, was moving upon him, instead of passing outside of the south rail, and getting upon the footboard from the side, as would be the safe way, and which, we assume, must be the usual way in which switchmen get upon the footboard. To do otherwise, particularly at night, would be to convict Ray of the utmost recklessness. As Ray’s left foot was the one which was caught in the guard rail, his body and right foot must have been at the time between the two tracks; and, as the toe of the left foot was at the mouth of the open space, pointing to the west, he must at the time have been squarely facing to the west, and facing the engine. Plaintiff urges the very great improbability that the body should have been dragged by the -engine, and that the foot should have been forced and wedged into the open space, with the heel in front, while it was being so dragged. We were disposed at first to agree with counsel as to the great improbability of such a thing having happened, and to discard the defendant’s theory on that point; but we do not, on reflection, think it was as unlikely to have occurred as we imagined it was. That Ray’s body was dragged by the engine after he fell has been established beyond question, for all parties agree that the body was found do the east of the point where the foot was wedged and cut off. If the body was dragged eastward beyond that point, there is no good reason to be suggested why it should not have been dragged from a point directly opposite to the switch lever to the point where the foot lodged; and there is no reason why,, as the body, with the face upward and the head to the east, was dragged to the east, the left leg being dragged along the south *513 rail, the heel downward, as the heel passed into the open space, it should not have been crushed and mashed in it by the wheel of the engine, which followed immediately behind. There is nothing before the court to establish the fact that Ray himself placed his foot into the guard rail. We could only reach that conclusion because we might not be able in any other satisfactory way to account for its having got there.
We cannot properly make conjectural conclusions the basis of a judgment for damages. We do not think it necessary to analyze, any further than we have, the testimony in the record. We have considered and given due weight to the testimony of Murshall and of Burside as to their not having seen any evidence of the body being dragged from a point west of that where the foot was found, and no portion of the body having been «found in that space. We have also considered the criticism of the engineer’s testimony by plaintiff’s counsel, based upon the claim that he had prior to the trial made statements much less positive than those which he made on the trial as to having seen Ray upon the footboard. We have given weight to the verdict of the jury, and the refusal of the district judge to set it aside, but we cannot reach the conclnsion that the verdict of the jury and the judgment of the court thereon were sustained by the law and the evidence. We agree with plaintiff that the defendant was remiss in not taking precautions to secure its employes, and to guard against the danger of getting their feet caught in the guard rails by blocking them at a point so dangerous as this point seems to have been; but, unless that remissness was the proximate cause of the damage in this particular ease, we cannot make it the basis for a judgment in favor of the plaintiff.
For the reasons herein assigned, it is hereby ordered, adjudged, and decreed that the verdict of the jury be set aside, and tbe judgment of the court thereon rendered be, and the same is hereby, annulled, avoided, and reversed; and it is now ordered, adjndged, and decreed that plaintiff’s demand be rejected, and her suit dismissed, with costs in both courts.